# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

RUTH A. SEELYE,

        *Plaintiff*,

*v*.

COMMISSIONER OF SOCIAL SECURITY,

        *Defendant*.

_____/

CASE NO. 17-cv-12827

DISTRICT JUDGE GERSHWIN A. DRAIN

MAGISTRATE JUDGE PATRICIA T. MORRIS

## REPORT AND RECOMMENDATION ON CROSS MOTIONS FOR SUMMARY JUDGMENT (Docs. 14, 15)

## I.    REPORT

### A.  Introduction and Procedural History

This is an action for judicial review of a final decision by the Commissioner of Social Security denying Plaintiff Ruth Seelye's claim for Supplemental Security Income ("SSI") benefits under Title XVI, 42 U.S.C. §§ 1381-1383f. (Doc. 1). Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of Reference, this case was referred to the undersigned Magistrate Judge. (Doc. 4). The matter is currently before the court on cross-motions for summary judgment. (Docs. 14, 15).

Plaintiff was born on July 15, 1971, making her 42 years old when she filed her initial application for SSI on January 11, 2014. (Tr. 157-61). Plaintiff had filed three previous SSI applications—in January 2007, June 2008, and September 2010—none of which she appealed from the initial denial. (Tr. 68). After the Commissioner denied her most recent claim, Plaintiff requested a hearing, (Tr. 98-100), which was held before

1

Administrative Law Judge ("ALJ") David Bruce, (Tr. 34-66). Ultimately, the ALJ found that Plaintiff had not been under a disability during the relevant time period, (Tr. 9-31), and the Appeals Council denied Plaintiff's request for review. (Tr. 1-8). This action followed.

### B.  Standard of Review

The district court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). The district court's review is restricted to determining whether the "Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Sullivan v. Comm'r of Soc. Sec.*, 595 F. App'x 502, 506 (6th Cir. 2014) (internal citations omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotations omitted).

The court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *See Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6th Cir. 1989). The court will not "try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Id.* at 286 (internal citations omitted).

2

### C.  Framework for Disability Determinations

Under the Act, "DIB and SSI are available only for those who have a 'disability.'"

*Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI).   The

Commissioner's regulations provide that disability is to be determined through the

application of a five-step sequential analysis:

> (i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled. . . .
>
> (ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled. . . .
>
> (iii) At the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s) that meets or equals one of our listings in appendix 1 of this subpart and meets the duration requirement, we will find that you are disabled. . . .
>
> (iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled. . . .
>
> (v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other

> work. If you can make an adjustment to other work, we will
> find that you are not disabled. If you cannot make an
> adjustment to other work, we will find that you are disabled.

20 C.F.R. §§ 404.1520, 416.920. *See also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528,

534 (6th Cir. 2001). "Through step four, the claimant bears the burden of proving the

existence and severity of limitations caused by her impairments and the fact that she is

precluded from performing her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d

469, 474 (6th Cir. 2003). A claimant must establish a medically determinable physical or

mental impairment (expected to last at least twelve months or result in death) that rendered

her unable to engage in substantial gainful activity. 42 U.S.C. § 423(d)(1)(A). The burden

transfers to the Commissioner if the analysis reaches the fifth step without a finding that

the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir.

2006). At the fifth step, the Commissioner is required to show that "other jobs in significant

numbers exist in the national economy that [the claimant] could perform given her RFC

[residual functional capacity] and considering relevant vocational factors." *Rogers*, 486

F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

### D. ALJ Findings

Following the five-step sequential analysis, the ALJ concluded that Plaintiff had not

been under a disability, as defined in the Social Security Act, since January 11, 2014, the

date her application was filed. (Tr. 25). First, the ALJ found that Plaintiff had not engaged

in substantial gainful activity since the application date of January 11, 2014. (Tr. 14). Next,

the ALJ determined that Plaintiff had the following severe impairments: degenerative disc

disease of the cervical spine, carpal tunnel syndrome, and obesity. (*Id.*). Plaintiff did not,

4

however, have an impairment or combination of impairments that met or medically equaled the severity of a listed impairment. (Tr. 15). The ALJ concluded that Plaintiff had the residual functional capacity ("RFC") to

> perform light work as defined in 20 CFR 416.967(b) except for frequent handling and fingering, bilaterally, as opposed to constantly. The claimant is also limited to performing simple tasks; making simple work related decisions; and having frequent contact with co-workers and supervisors, but no more than occasional contact with the public. She should avoid all exposure to hazards such as unprotected heights and moving, mechanical parts and/or machinery; and no commercial driving.

(Tr. 17). Plaintiff had no past relevant work, but the ALJ found that considering Plaintiff's age, education, work experience, and RFC, jobs that Plaintiff could perform existed in significant numbers in the national economy. (Tr. 24).

### E.  Administrative Record

#### 1.       Medical Evidence

The court has thoroughly reviewed Plaintiff's medical record. In lieu of summarizing her medical history here, the court will make reference and provide citations to the record as necessary in its discussion of the parties' arguments.

#### 2.       Application Reports and Administrative Hearing

#### i.     Plaintiff's Function Report

Plaintiff completed a function report on January 31, 2014. (Tr. 205). She described how her ability to work was limited because she could "hardly move" when she woke up every day, and she had severe pain in her neck, back, legs, and knees. (Tr. 198). She couldn't walk "very far" and standing made her lightheaded and dizzy; before the onset of her conditions, she had been able to "walk, move with ease, be on [her] feet." (Tr. 198-99).

5

She did not indicate that she used any ambulation aids (Tr. 204). For medications, she reported taking Ambien. (Tr. 205).

She marked that her illnesses, injuries, or conditions affected her ability to lift, squat, bend, stand, reach, walk, sit, kneel, hear, climb stairs, see, complete tasks, concentrate, and use her hands, as well as her memory. (Tr. 203). She explained: "can't lift much have arthritis and fibromyalgia so in a lot of pain to be able to move." (*Id.*). By Plaintiff's estimate, she could walk fifty steps before needing to stop and rest for fifteen to twenty minutes. (*Id.*) She did not finish what she started, but followed written or spoken instructions "fine." (*Id.*). She also got along "fine" with authority figures. (Tr. 204). She handled changes in routine "not well." (*Id.*).

On an average day, Plaintiff would take her son to school, have breakfast, and take her medications. (Tr. 199). Once they started working, she would take a shower and get dressed, and wait for her son to get out of school. (*Id.*).

She went outside daily and was able to drive and to go out alone. (Tr. 201). She cared for her son, who also "[did] a lot for himself," with some help. (Tr. 199). Once a month she went grocery shopping. (Tr. 201). She was able to pay bills, count change, handle a savings account, and use a checkbook or money orders. (*Id.*).

She indicated she had no problems performing personal care, including dressing, bathing, caring for her hair, shaving, feeding herself, or using the toilet. (Tr. 199). She prepared food like sandwiches and microwave food daily, taking about an hour to do so. (*Id.*). Previously, she had been able to make meals. (Tr. 200). As for household chores, she

6

reported that she "[couldn't] move well enough to do most chores," and needed help or encouragement. (*Id.*).

Her hobbies included reading and watching TV, which she did daily. (Tr. 202). But she found that reading too long made her lightheaded. (*Id.*). As for social activities, she talked on the phone daily. (*Id.*). She felt anxious in big groups, so she tried to avoid them. (Tr. 203). Asked whether she had noticed any unusual behavior or fears, she responded that she had "bad dreams and lots of fears now." (Tr. 204).

### ii.   Third Party Function Report

Plaintiff's mother, Tiffany Holcomb, completed a third-party function report for Plaintiff on January 31, 2014. (Tr. 186). She stated she spent a couple of days a week with Plaintiff, visiting and watching movies. (*Id.*). She explained that Plaintiff's impairments limited her ability to work by causing "pain and extreme discomfort with any prolonged standing or rigor[o]us activity." (*Id.*). Before, Plaintiff had been able to "stand and move around for longer period of time." (Tr. 187). Additionally, Plaintiff's sleep apnea affected her sleep. (*Id.*).

Plaintiff's mother marked the following as being affected by Plaintiff's illnesses, injuries, or conditions: lifting, squatting, bending, standing, walking, kneeling, talking, and stair climbing. (Tr. 191). She explained: "Physical activity is more difficult and causes pain." (*Id.*). She estimated that Plaintiff could walk 100 to 110 feet before needing to rest for a few minutes. (*Id.*). Plaintiff's mother did not indicate that Plaintiff used any ambulation aids. (Tr. 192).

On an average day, Plaintiff would shower, take her son to school, and sit and watch television. (Tr. 187). Plaintiff took care of her son with help from "Joe," who was not identified further. (Tr. 187-88). She cooked "microwave meals[,] mostly," because she could not stand long enough to cook at the stove. (Tr. 188). As house and yard work caused her pain, she had someone help her with household chores. (*Id.*). Plaintiff's mother stated that Plaintiff had no problems with personal care, including dressing, bathing, caring for her hair, shaving, feeding herself, or using the toilet. (Tr. 187).

Plaintiff "hardly ever" left the house, but her mother noted she was able to drive and go out alone. (Tr. 189). Once a month, Plaintiff spent a couple of hours shopping for groceries. (*Id.*). She was able to pay bills, count change, handle a savings account, and use a checkbook or money orders. (*Id.*). Her hobbies included reading, watching television, and playing computer games, all of which she did "often and well," with no change due to her illnesses, injuries, or conditions. (Tr. 190).

Additionally, Plaintiff's mother reported that Plaintiff spent time with "Facebook[] friends and family" and talked on the phone to family members daily, although she could not go out to visit people. (*Id.*). She remarked that Plaintiff got along well with authority figures and handled stress and changes in routine well. (Tr. 192). And she described Plaintiff as being able to pay attention for "long periods of time," finish what she started, and follow written or spoken instructions well. (*Id.*).

### iii.    Plaintiff's Testimony at the Administrative Hearing

On March 14, 2016, an administrative hearing was held before ALJ David Bruce. (Tr. 34-66). Plaintiff appeared by video teleconference, (Tr. 36), and testified. (Tr. 40-60).

8

Answering preliminary questions, Plaintiff testified that she was currently 44 years old and lived with her mother, her eleven-year-old son, and her son's father, although her son's father was often out of town. (Tr. 41). As for her educational background, Plaintiff completed through eleventh grade; she never acquired her GED. (Tr. 42-43). She could read and write in English. (Tr. 43). Due to her recent cervical fusion surgery (Tr. 38), Plaintiff was unable to drive at the time of the hearing; she had been able to drive before surgery, (Tr. 42), though she had sometimes needed to pull over because she felt lightheaded and dizzy. (Tr. 56). Her son's father or her friend would drive her when she needed to travel long distances. (Tr. 58).

Plaintiff explained that she felt she could not work due to multiple medical issues, including feeling lightheaded and dizzy, blood pressure issues, tachycardia, thyroid issues, diabetes, depression, anxiety, "memory issues" resulting from low Vitamin B, and side effects from medication. (Tr. 43-45). At the time of the hearing, she was taking "a double dose" of Norco because of her recent neck surgery, as well as Trokendi for headaches, Zoloft, Imitrex for migraines, Imdur for heart issues, Norvasc for blood pressure, Armour Thyroid for thyroid issues, Abilify, and Vitamin B and Vitamin D supplements. (Tr. 45-46). She stated that the medications "help me like with the problem that they're supposed to help with, but with taking so many, they make me sick sometimes. And when I add my pain medication . . . it's like I have to pretty much stay right in bed for the next four or five hours because I'm so dizzy and off balance." (Tr. 46-47). She had not taken the pain medicine before coming to testify because of its side effects. (Tr. 44). She described several

9

medical procedures she might undergo after recovering from her neck surgery, including carpal tunnel surgery and "electrocution to the heart" to regulate its rhythm. (Tr. 50-51).

After her neck surgery, she continued to suffer from headaches and migraines, and she also began experiencing "sharp pains" and numbness down her left arm. (Tr. 49). She had not gone to physical therapy. (*Id.*). Additionally, she complained that her balance issues were worse after the surgery: "[A] lot of times when I stand up, I have to sit right back down because I'm so wobbly." (Tr. 58). She testified that an occupational therapist had told her she needed a walker and "probably should have had one before" due to frequent bouts of lightheadedness and dizziness, (Tr. 50); she had passed out "a couple of times." (Tr. 54). She had not used a cane or walker on the day of the hearing. (Tr. 50).

Although a counselor in Saginaw had prescribed her medication for depression before she moved to Capac, about an hour and twenty minutes away; she did not see any counselors at the time of the hearing but "right now they're trying to find [her] different specialists in [her] area." (Tr. 52). She had never been hospitalized because she wanted to hurt herself or somebody else. (*Id.*).

In regard to her carpal tunnel syndrome, she testified that she had "good days" and "bad days," but "most days" she had "a lot of tingling" in her hands caused by "lumps on [her] wrists." (Tr. 54). Her carpal tunnel syndrome also caused her to drop things and made her hands go numb. (Tr. 51).  To alleviate the pain, she wore braces to "stabilize [her] hand." (Tr. 54).

On Plaintiff's bad days—which she estimated having three times a week, prior to her surgery—she would take extra pain medication and "just sleep" for most of the day.

(Tr. 57-58). On good days, she and her son would do chores like laundry together, though usually her mother took care of household chores. (Tr. 54). She testified that usually she did not like to go grocery shopping and would "just go grab what [she] need[s] and that's it," or she would ask her son's father to pick up items on his way home. (Tr. 55-56).

Plaintiff retained the ability to feed herself and to shower using a shower chair. (Tr. 55). She could no longer do her hair or her makeup. (*Id.*). She regularly took her son to Cub Scouts meetings, attended his wrestling meets, and did "fun things" with him. (*Id.*). Her son had a dog, "but he does all the care." (Tr. 56-57). Her hobbies had previously included researching her genealogy, but now, she said, "I read over it, and go through my books and stuff, but not like I used to be able to do." (Tr. 56).

At night, she took sleeping pills because otherwise she would "toss and turn" and be "up and down all night," causing her to be "tired the next day still." (Tr. 56-57). Every day, she took two to three naps lasting an hour or two each, and often laid down to rest. (Tr. 57).

According to Plaintiff's estimate, she could walk slowly for ten or fifteen minutes unassisted before needing to rest, and stand for the same length of time. (Tr. 52-53). She could sit for about half an hour. (Tr. 53). She could lift "[a]bout five pounds. They're saying a gallon of milk." (*Id.*). When asked whether that was a restriction since the surgery, she said that was "[p]robably the most [she'll] ever be able to do" due to arthritis in her lower back and knees (Tr. 53). Her back started to hurt during the hearing. (Tr. 53).

11

### iv.   The Vocational Expert's Testimony at the Administrative Hearing

Vocational Expert ("VE") Bob Hammond also testified at the administrative hearing. (Tr. 60-63). The ALJ found there was no past relevant work in Plaintiff's case. (Tr. 60-61). The ALJ then posed his first hypothetical:

> [A]ssume a hypothetical individual of the same age and education as the Claimant, with no past work history[,] . . . limited to light work as defined in the regulations. May handle and finger frequently, as opposed to constantly, bilaterally. May perform simple tasks or work-related decisions, which I define to be SVP 1 and 2 type jobs, with frequent contact with co-workers and supervisors, but I'm going to say no more than occasional contact with the public. This person must avoid exposure to unprotected heights; hazards; moving, mechanical parts or machinery. No operating a motor vehicle as part of the job.

(Tr. 61).

The VE testified that with those limitations, positions would be available as a housekeeper/maid (2,700 in Michigan, 133,000 nationally); an ejection molder (1,700 in Michigan, 121,000 nationally); and a sorter (1,300 in Michigan, 89,000 nationally). He confirmed that his testimony was consistent with the Dictionary of Occupational Titles ("DOT") and its companion publications. (Tr. 62).

Lastly, the ALJ asked whether those jobs would remain available if additionally, "this person would be off task for one whole hour of the day in addition to normal breaks and lunch . . . away from the work station." (Tr. 62). According the VE, no work would be available with that limitation. (Tr. 62). The DOT does not address off-task behavior, but the VE testified that according to his experience, employers would tolerate off-task

12

behavior a maximum of six percent of the time in a production position and ten percent of the time in "a position where it's based upon the shift." (Tr. 63).

### F. Governing Law

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B). The regulations carve the evidence into categories: "acceptable medical sources" and "other sources." 20 C.F.R. § 404.1513. "Acceptable medical sources" include, among others, licensed physicians and licensed or certified psychologists. *Id.* § 404.1513(a). "Other sources" include medical sources who are not "acceptable" and almost any other individual able to provide relevant evidence. *Id.* § 404.1513(d). Only "acceptable medical sources" can establish the existence of an impairment. SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006). Both acceptable and non-acceptable sources provide evidence to the Commissioner, often in the form of opinions "about the nature and severity of an individual's impairment(s), including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions." *Id*. When acceptable medical sources issue such opinions, the regulations deem the statements to be "medical opinions" subject to a multi-factor test that weighs their value. 20 C.F.R. § 404.1527. Excluded from the definition of "medical opinions" are various decisions reserved to the Commissioner, such as whether the claimant meets the statutory definition of disability and how to measure her RFC. *Id.* § 404.1527(d).

The ALJ must use a six-factor balancing test to determine the probative value of medical opinions from acceptable sources. 20 C.F.R. § 404.1527(c). The test looks at

whether the source examined the claimant, "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); *see also* 20 C.F.R. § 404.1527(c). ALJs must also apply those factors to "other source" opinions. *See Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 540-42 (6th Cir. 2007); SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006).

Certain opinions of a treating physician, in contrast, receive controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and are "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2); *see also Wilson*, 378 F.3d at 544. The only opinions entitled to dispositive effect deal with the nature and severity of the claimant's impairments. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2 (July 2, 1996). Therefore, the ALJ does not owe a treating opinion deference on matters reserved to the Commissioner. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2 (July 2, 1996). The ALJ "will not give any special significance to the source of an opinion" regarding whether a person is disabled or unable to work, whether an impairment meets or equals a Listing, the person's RFC, or the application of vocational factors. 20 C.F.R. § 404.1527(d)(3).

The regulations mandate that the ALJ provide "good reasons" for the weight assigned to a treating source's opinion in the written determination. 20 C.F.R. §

404.1527(c)(2); *see also Dakroub v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir.

2007). Therefore, a decision denying benefits

> must contain specific reasons for the weight given to the treating source's
> medical opinion, supported by the evidence in the case record, and must be
> sufficiently specific to make clear to any subsequent reviewers the weight
> the adjudicator gave to the treating source's opinion and the reasons for that
> weight.

SSR 96-2p, 1996 WL 374188, at *5 (July 2, 1996); *see also Rogers*, 486 F.3d at 242. For

example, an ALJ may properly reject a treating source opinion if it lacks supporting

objective evidence. *Revels v. Sec'y of Health & Human Servs.*, 882 F. Supp. 637, 640-41

(E.D. Mich. 1994), *aff'd*, 51 F.3d 273 (Table), 1995 WL 138930, at *1 (6th Cir. 1995).

The claimant must provide evidence establishing his RFC. The statute lays the

groundwork for this, stating, "An individual shall not be considered to be under a disability

unless he furnishes such medical and other evidence of the existence thereof as the

Secretary may require." 42 U.S.C. § 423(d)(5)(A); *see also Bowen*, 482 U.S. at 146 n.5.

The RFC "is the most he can still do despite his limitations," and is measured using "all

the relevant evidence in [the] case record." 20 C.F.R. § 404.1545(a)(2).

### G. Analysis

Here, Plaintiff contends the ALJ erred in that: (1) the ALJ's Step Three

determination is improper and not supported by substantial evidence, and (2) the ALJ

improperly rejected the opinion of treating source Dr. Paul Meyer. (Doc. 14 at ID 1001).

### 1.    The ALJ's Step Three Determination

Plaintiff accuses the ALJ of having failed to properly discuss Listing 1.04(A),

"leav[ing] the Court to speculate as to which of the multiple elements of Listing 1.04(A)

the ALJ apparently felt were not satisfied or equaled." (Doc. 14 at ID 1004). And Plaintiff

avers the record contains a "multitude of evidence" supporting a finding that Plaintiff met

or medically equaled the listing. (*Id.*).

As an initial matter, I note that at the administrative hearing—where Plaintiff was

represented by a different attorney than she is today—Plaintiff's attorney argued only that

a Step Five allowance would be appropriate. (Tr. 63). When the ALJ asked whether the

attorney felt Plaintiff met any listing, the attorney responded:

> I didn't argue the listing because of so many of the intricate things that are
> required. I have a positive straight leg raise that's noted in some spots and not
> in others, I have some weakness that's noted and not in others. So I really felt
> that, given the combination of her impairments, it was really more appropriate
> to argue a Step [Five] case here. This is really an issue of sustainability . . . .

(Tr. 63-64).

In any case, I suggest that substantial evidence in the record supports the ALJ's

finding that Plaintiff does not meet or medically equal Listing 1.04(A).

To show medical equivalence, the claimant must "present medical findings equal in

severity to *all* the criteria for the one most similar listed impairment." *Sullivan v. Zebley*,

493 U.S. 521, 531 (1990) (emphasis in original). Those findings must be "at least equal in

severity and duration to the criteria" in the Listing. 20 C.F.R. § 416.926(a); *Biestek v.*

*Comm'r of Soc. Sec.*, __ F. App'x __, 2017 WL 6605603, at *2 (6th Cir. Dec. 27, 2017)

("[M]edical equivalency is not a refuge for claimants who show only intermittent signs of

impairment.").

Listing 1.04(A) covers "[d]isorders of the spine (e.g., herniated nucleus pulposus,

spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis,

vertebral facture) resulting in compromise of a nerve root . . . or the spinal cord." 20 C.F.R.

Pt. 404, Subpt. P, App. 1, § 1.04(A). Additionally, it requires:

> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine) . . . .

*Id.* According to Plaintiff's brief, she seeks to put only her cervical spine impairment at

issue, making the final factor irrelevant. (Doc. 14 at ID 1004).

The ALJ's Step Three analysis spans several pages and considers whether Plaintiff

met or medically equaled several listings. (Tr. 15-17). As to Listing 1.04, he explains that

he found Plaintiff did not satisfy the terms of the listing because she

> is not so functionally limited and the evidence does not support the required medical findings . . . such as a condition that results in compromise of a nerve root with evidence of nerve root compression, spinal arachnoiditis, or lumbar spinal stenosis resulting in pseudoclaudication established by findings on appropriate medically acceptable imaging and manifested by chronic pain and weakness. Additionally, while objective clinical findings have revealed positive bilateral straight leg raises, there is no indication that this was in both the seated AND supine positions.

(Tr. 15) (internal citations omitted).

Further, the ALJ's finding at Step Three is supported by his discussion later in his

opinion, at Step Four. (Tr. 18, 20-21). *See Gower v. Comm'r of Soc. Sec.*, No. 13-14511,

2015 WL 163830, at *9 (E.D. Mich. Jan. 13, 2015) ("[T]he ALJ's cursory *discussion* of

Listing 1.04 does not require remand, since the ALJ's opinion as a whole demonstrates

sufficient consideration of the relevant evidence.") (emphasis in original); *see also Bledsoe*

*v. Barnhart*, 165 F. App'x 408, 411 (6th Cir. 2006) (finding the ALJ's Step Three finding

sufficient where he described the evidence earlier in decision, "even though he did not spell out every fact a second time under the step three analysis").

As Plaintiff emphasizes, an X-ray of her cervical spine prior to her surgical fusion revealed herniated nucleus pulposus with spondylosis at C3-4 and C4-5 "with cord contact and displacement and compression at both levels." (Tr. 623). It is true, too, that on several occasions her range of motion was observed to be limited, (Tr. 621, 623, 736, 741, 754)—but Plaintiff also regularly demonstrated a full range of motion in her spine, (Tr. 252, 288, 418, 420, 507, 619, 629, 641, 649, 692, 774), including at her most recent appointments, post-cervical fusion, (904-05, 912).

Further, she frequently denied any muscle weakness or atrophy, (Tr. 250, 258, 265, 272, 279, 317, 324, 331, 338, 346, 354, 433, 440, 506, 556, 628, 639, 647, 697, 724, 745, 753, 759, 765, 840, 904, 916), *cf.* (Tr. 735 ("weakness"), 739 ("has hand weakness"), 778 (self-reported weakness)). On examination, she regularly exhibited full strength in her upper bilateral extremities. (Tr. 252, 259, 265, 289, 355, 507, 615, 630, 642, 649, 692, 724, 730, 736, 746, 754, 760, 774, 904-05, 912).

Although at times she complained of numbness, (Tr. 288, 354, 361, 433, 448, 506, 628, 639, 647, 740, 753, 772, 778, 840, 904, 915-16), just as often, she denied any numbness or tingling sensations, (Tr. 250, 258, 265, 272, 279, 317, 324, 331, 338, 346, 440, 556, 697, 724, 745, 759, 765). And examinations repeatedly revealed that she had suffered no sensory loss, (Tr. 621, 630, 641, 649, 692, 774, 905, 912), or reflex loss, (Tr. 641, 649, 698, 754, 766, 774).

18

For all of the above reasons, therefore, I suggest that substantial evidence supports the ALJ's finding that Plaintiff did not meet or medically equal Listing 1.04(A).

### 2. The ALJ's Treatment of the Opinion from Treating Source Dr. Paul Meyer

Second, Plaintiff contends that the ALJ improperly rejected Dr. Meyer's treating physician opinion. (Doc. 14 at 1006). The ALJ must use a six-factor balancing test to determine the probative value of medical opinions from acceptable sources. 20 C.F.R. § 404.1527(c). The test looks at whether the source examined the claimant, "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); *see also* 20 C.F.R. § 404.1527(c). Additionally, certain opinions from treating physicians receive controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and are "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2); *see also Wilson*, 378 F.3d at 544. The regulations mandate that the ALJ provide "good reasons" for the weight assigned to a treating source's opinion in the written determination. 20 C.F.R. § 404.1527(c)(2); *see also Dakroub v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007).

In this case, treating physician Dr. Paul Meyer completed a physical residual functional capacity questionnaire for Plaintiff on January 29, 2016. (Tr. 791-95). In it, Dr. Meyer reported that he had seen Plaintiff every one to two months since April 2012. (Tr.

792). Her diagnoses were fibromyalgia, lumbago, cervicalgia, anxiety, ADD, carpal tunnel, and hypertension; the prognosis was "lifetime." (*Id*). He described her symptoms as "pain, anxiety, fatigue." (*Id*). The clinical findings and objective signs were "pain in lumbar spine and cervical spine" and "decreased use of hands due to carpal tunnel." (*Id*). Additionally, he averred that her pain medication could cause drowsiness and dizziness. (*Id*). He marked that Plaintiff's anxiety contributed to the severity of her symptoms and functional limitations. (Tr. 793). According to Dr. Meyer's estimate, Plaintiff was likely to be off-task twenty-five percent or more of a typical workday. (*Id*).

Further, Dr. Meyer predicted that Plaintiff would be incapable of even "low stress" jobs due to "chronic incapacitating dizzyness." (*Id*). He estimated Plaintiff could walk zero city blocks without rest or severe pain, could sit one hour at a time, and could stand twenty minutes at a time. (*Id.*). In an eight-hour working day with normal breaks, she could sit or stand/walk for a total of less than two hours. (Tr. 794). Additionally, she would need to take five-minute walks approximately every forty-five minutes during an eight-hour working day. (*Id*). She would need a job that permitted shifting positions at will and would need to take unscheduled breaks "many" times in a day, resting thirty to sixty minutes before returning to work. (*Id*).

Dr. Meyer marked that Plaintiff could occasionally lift less than ten pounds, rarely lift up to twenty pounds, and never lift fifty pounds. (*Id*). She could never look down and only rarely turn her head right or left, look up, or hold her head in a static position; she could rarely twist or climb stairs and never stoop/bend, crouch/squat, or climb ladders. (Tr. 794-95). Her reaching, handling, and fingering were also limited: She could grasp, turn, or

twist objects, perform fine manipulations, or reach for only ten percent of an eight-hour working day. (Tr. 795). Finally, Dr. Meyer indicated that Plaintiff's impairments were likely to produce "good days" and "bad days," and estimated that she would likely be absent from work more than four days a month as a result of her impairments or treatment. (*Id*).

To begin, the ALJ noted that Dr. Meyer's opinion "appears to rest at least in part on an assessment of an impairment[s] outside the doctor's area of expertise. Dr. Meyer is the claimant's family practitioner and is neither an orthopedic specialist nor a psychiatric doctor." (Tr. 23). *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (holding that in determining the probative value of medical opinions from acceptable sources, one factor for the ALJ to consider is specialization of the treating source). Additionally, the ALJ observed that Dr. Meyer's opinion "is inconsistent with the objective clinical findings"—specifically, that most examinations of Plaintiff's bilateral upper extremities revealed 5/5 muscle strength, (Tr. 23) (citing Tr. 692, 754, 760); there was no evidence of ataxia or unsteadiness of Plaintiff's gait during examination, (Tr. 23) (citing Tr. 630, 641, 649); and Plaintiff has been "neurovascularly intact" on examination, (Tr. 23) (citing Tr. 630, 641, 692, 725, 730, 736, 741, 746, 754, 760, 766).

For those reasons, the ALJ assigned no weight to several of Dr. Meyer's opinions: that Plaintiff was limited to occasionally lifting or carrying less than ten pounds, rarely lifting or carrying up to twenty pounds, and sitting, standing, and/or walking for less than two hours in an eight-hour workday; and that Plaintiff was limited to use her bilateral

hands, fingers, and arms for grasping, turning, twisting objects, fine manipulation, or reaching (including overhead) no more than ten percent of an eight-hour workday. (Tr. 23).

In fact, the record seems replete with occasions on which Plaintiff evidenced full strength in her bilateral upper extremities, even in addition to those the ALJ referenced (Tr. 250, 252, 259, 265, 289, 355, 615, 649, 774), including once in the same appointment she self-reported weakness in her hands, (Tr. 759-60), and twice post-cervical fusion. (Tr. 904-05, 912). *Cf.* (Tr. 735 ("weakness"), 739 ("has hand weakness")). Further, Plaintiff repeatedly denied having any difficulty walking. (Tr. 250, 258, 265, 272, 317, 324, 331, 338, 354, 433, 440, 618); *also* (Tr. 774) (noting Plaintiff exhibited normal gait and station). And Plaintiff exhibited time and time again that she was "neurovascularly intact," with full strength in her upper extremities, (Tr. 252, 259, 265, 289, 355, 507, 615, 630, 642, 649, 692, 724, 730, 736, 746, 754, 760, 774, 904-05, 912), and no sensory, (Tr. 621, 630, 641, 649, 692, 774, 905, 912), or reflex loss, (Tr. 641, 649, 698, 754, 766, 774).

Next, taking into consideration Plaintiff's then-recent cervical fusion surgery, the ALJ assigned "some weight" to Dr. Meyer's opinion that Plaintiff could rarely turn her head to the left or right, look up, or hold her head in a static position. (Tr. 23).

Finally, the ALJ assigned no weight to Dr. Meyer's opinion that the Plaintiff would be off-task twenty-five percent or more of a typical workday, was incapable of tolerating the stress from even "low stress" jobs, and would miss more than four days of work per month due to her impairments. (Tr. 23). The ALJ explained: "Despite the claimant's limited education, on psychiatric evaluations/mental status examinations, she correctly calculated serial sevens (7's) and serial threes (3's), was able to spell words backwards,

and had normal recall, which suggest that she is capable of performing simple tasks and making simple work related decisions." (Tr. 23) (citing Tr. 550, 630, 641, 741, 754).

Indeed, the record reveals that Plaintiff repeatedly denied memory loss or confusion, (Tr. 251, 265, 272, 279, 288, 317, 324, 331, 338, 354, 361, 433, 440, 556, 724, 729, 735, 740, 745, 753), and on "mini mental status examination[s]" scored 30/30 with 3/3 recall (Tr. 627, 630, 641, 650). On even more occasions than the ALJ noted, she was able to name three objects, recite serial sevens, and spell words backwards, and exhibited normal recall. (Tr. 725, 730, 736, 746, 760). *See also* (Tr. 774) (noting Plaintiff exhibited "[n]ormal focus and concentration, [g]ood short and long term memory, [and n]ormal mentation").

Attempting to undercut the ALJ's reasoning, Plaintiff emphasizes that Dr. Meyer "has consistently performed physical examinations that have shown clinical findings consistent with his noted limitations." (Doc. 14 at ID 1007). Specifically, Plaintiff points to examinations at which Dr. Meyer noted "joint tenderness and pain with flexion in both knees; tenderness at the cervical and lumbar spine; lower extremity weakness; abdominal tenderness; bilateral straight leg raise tests; decreased range of motion in the cervical and lumbar spine; tenderness in the bilateral upper extremities; and positive Tinel's sign." (Doc. 14 at ID 1007) (citing Tr. 252, 325, 345, 347, 556, 735, 736, 739, 741, 744, 746, 752, 758, 760, 764, 766). Plaintiff also asserts that Dr. Meyer's assessment is consistent with "other evidence in the record," naming only "medical imaging showing significant cervical spine findings which eventually required the Plaintiff to undergo a cervical discectomy and fusion." (Doc. 14 at ID 1008) (citing Tr. 744). But the court must affirm the Commissioner's decision so long as it was supported by substantial evidence—even if

23

substantial evidence also supports a different conclusion. *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994).

Finally, Plaintiff emphasizes the length of Plaintiff's treating relationship with Dr. Meyer and the frequency with which he treated her. (Doc. 14 at 1007). But that is only one factor for the ALJ to consider in weighing a treating physician's opinion, alongside the supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source. 20 C.F.R. § 404.1527(c).

For the reasons described above, I suggest that the ALJ provided good reasons supported by substantial evidence for discounting Dr. Meyer's opinion, and that remand is not justified on this ground.

## II.    **RECOMMENDATION**

For the reasons stated above, the Court **RECOMMENDS** that Plaintiff's Motion for Summary Judgment, (Doc. 14), be **DENIED**, the Commissioner's Motion for Summary Judgment, (Doc. 15), be **GRANTED**, and this case be **DISMISSED**.

## III.    **REVIEW**

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States*

*v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Dakroub v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge. Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date:  May 1, 2018                     S/ PATRICIA T. MORRIS
                                       Patricia T. Morris
                                       United States Magistrate Judge


### CERTIFICATION

I hereby certify that the foregoing document was electronically filed this date through the Court's CM/ECF system which delivers a copy to all counsel of record.

Date: May 1, 2018                      By s/Kristen Castaneda
                                       Case Manager

25